## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LAUREN REECE, MARGARET PONDER, DIANA FERRARA and LORETTA MOUTRA, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>VOLKSWAGEN AKTIENGESELLSCHAFT, VOLKSWAGEN GROUP OF AMERICA, INC., AUDI AKTIENGESELLSCHAFT and AUDI OF AMERICA, INC.,<br><br>    Defendant. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs  Lauren Reece, Margaret Ponder, Diana Ferrara, and Loretta Moutra ("Plaintiffs "), individually and on behalf of the other members of the below-defined statewide class, which they respectively seek to represent ("Class"), hereby allege against Volkswagen Aktiengesellschaft ("VWAG"), Volkswagen Group of America, Inc. ("VW America") (together, "Volkswagen" or "VW"), Audi Aktiengesellschaft ("Audi AG"), and Audi  of America, Inc. ("Audi America") (together, "Audi") (collectively, "Defendants"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## INTRODUCTON

1.    For  decades,  Volkswagen  and  Audi  branded  themselves  as  a

1

manufacturer of reliable cars.

2.      As a result, consumers reasonably expect, based on their long-term advertising and branding, that Defendants' vehicles will operate safely, reliably, and without major mechanical failures during their expected useful lives.

3.      Defendants design, manufacture, and sell motor vehicles equipped with the EA888 2.0-liter TSI engine (the "Engine").

4.      The Engine is installed in model year 2018-2021 Volkswagen Tiguan, model year 2018-2023 Volkswagen Atlas, model year 2018-2022 Volkswagen Passat, model year 2018-2024 Volkswagen Jetta GLI, 2018-present Audi Q3, 2018-present Audi Q5, and 2018-present Audi Q7 vehicles containing the EA888 2.0-liter TSI engine (the "Class Vehicles").[1]

5.      The Engine suffers from a design and/or manufacturing defect wherein it excessively consumes oil creating carbon buildup. The carbon build up  causes (1) the PCV valve to stick, causing crankcase overpressurization that damages seals and expands and cracks the plastic oil pan cover, resulting in substantial oil leaks and consumption and (2) spark plug fouling, both of which causes severe drivability issues and damages critical engine components that costs thousands of dollars to repair (the "Defect").

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models and model years included in the definition of Class Vehicles.

6.     The Class Vehicles consume so much oil that their sumps will be emptied with about 4,000 miles left before an oil change is recommended.

7.     The Defect is a latent defect that manifests within and outside the warranty period and well within the reasonably expected useful life of both the Class Vehicles and the Engines installed in them.

8.     The Defect is covered by Defendants' warranties, but Defendants refuse to honor the warranties.

9.     Moreover, Defendants have not released or made freely available a countermeasure that adequately fixes the Defect, including more robust piston rings.

10.     The Defect affects all Class Vehicles.

11.     Had Plaintiffs and the other Class Members known about the Defect, they would not have purchased or leased the Class Vehicles or would have paid substantially less for them.

12.     The Defect has diminished the value of the Class Vehicles.

13.     On behalf of themselves and the proposed Class defined below, Plaintiffs assert claims against Defendants for breach of express and implied warranties, fraudulent omission and for violations of various state consumer protection statutes. Plaintiffs seek damages and equitable relief to compensate Plaintiffs and the proposed Class and to remedy the Defect.

## **JURISDICTION AND VENUE**

3

14.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one member of the Class is diverse in citizenship from one Defendant and the aggregate amount in controversy exceeds $5,000,000 and minimal diversity exists.

15.    This Court has personal jurisdiction over Volkswagen Group of America, Inc. because it conducts substantial and continuous business in New Jersey and is Defendants' chosen state of incorporation.

16.    Venue is proper in this district under 28 U.S.C. § 1391 because Volkswagen Group of America, Inc. resides within this district and a substantial part of the events and omission giving rise to Plaintiffs 'claims occurred within this district.

## PARTIES

### Alabama Class

### Plaintiff Reece

17.    Plaintiff Lauren Reece is located in Birmingham, Alabama and is a resident of Alabama.

18.    Plaintiff owns a 2021 Volkswagen Tiguan which she purchased used from Echo Park Birmingham located at 2001 Tom Williams Way in Birmingham, Alabama on August 29, 2022. The mileage at the time of purchase was approximately 12,000.

19.    Prior to purchasing her Class Vehicle, Plaintiff Reece reviewed Volkswagen's promotional materials and interacted with at least one sales representative.    None of Volkswagen's promotional materials or sales representatives disclosed the Defect.

20.    Through her exposure and interaction with Volkswagen, Plaintiff Reece was aware of Volkswagen's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase her Class Vehicle. When she purchased the vehicle, she believed, based on Volkswagen's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Reece purchased her vehicle did Volkswagen disclose to her that her vehicle was not safe or dependable, or that it was equipped with a defect.

21.    The Defect creates an unreasonable risk of injury to Plaintiff Reece, Class Vehicle occupants, and others on the road.

22.    On June 21, 2025, Plaintiff Reece was driving her Class Vehicle on a public road when the vehicle's check engine light illuminated, while the vehicle was running rough would not accelerate past 40 mph. The mileage at the time of this failure was approximately 49,226. Plaintiff presented her Class Vehicle to a local Express Oil Change, which identified an oil leak and refilled the Class Vehicle with oil. The next day, Plaintiff presented her Class Vehicle to Royal Automotive Inc. in

Vestavia Hills, Alabama where her Class Vehicle was diagnosed with a cracked oil pan, a failed PCV valve, and a failed upper timing cover and seal.

23.     Though Plaintiff's vehicle was nominally repaired, her Class Vehicle is still defective because the parts and components were replaced with equally defective Volkswagen parts and the underlying cause of the sticking PCV valve was not remedied.

24.     Plaintiff Reece did not receive the benefit of her bargain. She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Defect has significantly diminished the intrinsic and resale value of Plaintiff Reece's Class Vehicle.

25.     Had Volkswagen disclosed the Defect, Plaintiff Reece would not have purchased her Class Vehicle or would have paid less to do so.

26.     Plaintiff Reece would purchase a vehicle from Volkswagen in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

### **Plaintiff Ponder**

27.     Plaintiff Margaret Ponder is located in Birmingham, Alabama and is a resident of Alabama.

28.     Plaintiff owns a 2021 Volkswagen Atlas which she purchased used from Carmax located in Hoover, Alabama on December 26, 2024. The mileage at the time of purchase was approximately 54,000.

29.     Prior to purchasing her Class Vehicle, Plaintiff Ponder reviewed Volkswagen's promotional materials and interacted with at least one sales representative.    None of Volkswagen's promotional materials or sales representatives disclosed the Defect.

30.     Through her exposure and interaction with Volkswagen, Plaintiff Ponder was aware of Volkswagen's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase her Class Vehicle. When she purchased the vehicle, she believed, based on Volkswagen's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Ponder purchased her vehicle did Volkswagen disclose to her that her vehicle was not safe or dependable, or that it was equipped with a defect.

31.     The Defect creates an unreasonable risk of injury to Plaintiff Ponder, Class Vehicle occupants, and others on the road.

32.     In late July 2025, Plaintiff Ponder noticed oil stains on her driveway, and while driving on a public road, her Class Vehicle's check engine light

illuminated. The mileage at the time of this failure was approximately 62,000. On August 26, 2025, Plaintiff presented her Class Vehicle to Royal Automotive Inc. in Vestavia Hills, Alabama where her Class Vehicle was diagnosed with an oil leak from the upper timing cover, as well as a failed PCV valve and N80 valve. Two days later, Royal Automotive replaced the failed components.

33.    Though Plaintiff's vehicle was nominally repaired, her Class Vehicle is still defective because the parts and components were replaced with equally defective Volkswagen parts and the underlying cause of the sticking PCV valve was not remedied.

34.    Plaintiff Ponder did not receive the benefit of her bargain. She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Defect has significantly diminished the intrinsic and resale value of Plaintiff Ponder's Class Vehicle.

35.    Had Volkswagen disclosed the Defect, Plaintiff Ponder would not have purchased her Class Vehicle or would have paid less to do so.

36.    Plaintiff Ponder would purchase a vehicle from Volkswagen in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

**<u>Massachusetts Class</u>**

8

37.    Plaintiff Diana Ferrara is located in Hyde Park, Massachusetts and is a resident of Massachusetts.

38.    Plaintiff owns a 2018 Volkswagen Atlas which she and her husband purchased new using common marital funds from Quirk Volkswagen in Braintree, Massachusetts on or about October 2017. Plaintiff is the primary driver of the Class Vehicle.

39.    Prior to purchasing her Class Vehicle, Plaintiff Ferrara reviewed Volkswagen's promotional materials and interacted with at least one sales representative.    None of Volkswagen's promotional materials or sales representatives disclosed the Defect.

40.    Through her exposure and interaction with Volkswagen, Plaintiff Ferrara was aware of Volkswagen's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase her Class Vehicle. When she purchased the vehicle, she believed, based on Volkswagen's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Ferrara purchased her vehicle did Volkswagen disclose to her that her vehicle was not safe or dependable, or that it was equipped with a defect.

41.    The Defect creates an unreasonable risk of injury to Plaintiff Ferrara, Class Vehicle occupants, and others on the road. Specifically, Plaintiff's Class Vehicle experiences excessive oil consumption. While the Class Vehicle was under warranty, Plaintiff repeatedly took her Class Vehicle to her local Volkswagen dealership because the check engine oil light would come on in advance of the normal oil maintenance schedule, requiring the addition of oil prior to the normally scheduled oil maintenance. This has continued to occur to the present. In addition, at times, her husband would also have to add oil to the Class Vehicle prior to the normally scheduled oil maintenance. This has continued to occur to the present.

42.    Plaintiff Ferrara did not receive the benefit of her bargain. She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Defect has significantly diminished the intrinsic and resale value of Plaintiff Ferrara's Class Vehicle.

43.    Had Volkswagen disclosed the Defect, Plaintiff Ferrara would not have purchased her Class Vehicle or would have paid less to do so.

44.    Plaintiff Ferrara would purchase a vehicle from Volkswagen in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

**Texas Class**

45.    Plaintiff Loretta Moutra is located in Missouri City, Texas and is a resident of Texas.

46.    Plaintiff leased a 2018 Volkswagen Tiguan from River Oaks Volkswagen in Houston, Texas on or about January 26, 2019.

47.    Prior to leasing her 2018 Tiguan, Plaintiff Moutra reviewed Volkswagen's promotional materials and interacted with at least one sales representative. None of Volkswagen's promotional materials or sales representatives disclosed the Defect.

48.    From the beginning, Plaintiff's 2018 Tiguan experienced persistent oil leaks, which caused the check oil light to turn on. Consequently, Plaintiff had to add one quart of oil 1,000 miles prior to regular scheduled maintenance. Plaintiff ended her lease for the 2018 Tiguan in or about April, 2022.

49.    In or about April 2022, Plaintiff leased a 2022 Volkswagen Tiguan from Archer Volkswagen in Houston, Texas.

50.    Prior to leasing her 2022 Tiguan, Plaintiff Moutra reviewed Volkswagen's promotional materials and interacted with at least one sales representative. During these interactions, she discussed her prior experience with oil leaks in her 2018 Tiguan, but the sales representative did not disclose that any similar defect was present in the 2022 Tiguan.  None of Volkswagen's promotional materials or sales representatives disclosed the Defect.

51.     However, soon after entering her lease, Plaintiff's 2022 Tiguan began experiencing the same oil leaks that plagued her 2018 Tiguan. In part because of this, Plaintiff ended her lease in or about January, 2024 .

52.     Plaintiff currently owns a 2024 Volkswagen Atlas Cross Sport, which she purchased from Archer Volkswagen, Houston TX in or about about January, 2024.

53.     Prior to purchasing her 2024 Atlas, Plaintiff Moutra reviewed Volkswagen's promotional materials and interacted with at least one sales representative. During these interactions, she discussed her prior experience with oil leaks in her 2018 and 2022 Tiguan vehicles, the sales representative did not disclose that any such defect present in the 2024 Atlas.

54.     Through her exposure and interaction with Volkswagen, Plaintiff Moutra was aware of Volkswagen's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to lease her Class Vehicle. When she leased the vehicle, she believed, based on Volkswagen's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Moutra leased her vehicle did Volkswagen disclose to her that her vehicle was not safe or dependable, or that it was equipped with a defect.

55.    As a consequence of the Defect, Plaintiff Moutra, occupants of the Class Vehicle, and others on the road have been put in an unreasonable risk of injury. For example, in or about July, 2023, Plaintiff was driving to Arizona when, in the middle of the desert, the oil light came on in Plaintiff's 2022 Tiguan. Plaintiff pulled into a convenience store, the only one for miles around, but they did not carry synthetic oil, so Plaintiff was forced to make the dangerous drive back to her residence in Missouri City before her oil was completely depleted. Plaintiff reported the oil leaks and the need for early oil changes to her local Volkswagen dealership, but the dealership was unable or unwilling to remedy the issue for either vehicle.

56.    Plaintiff Moutra did not receive the benefit of her bargain. She leased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Defect has significantly diminished the intrinsic and value of Plaintiff Moutra's Class Vehicle.

57.    Had Volkswagen disclosed the Defect, Plaintiff Moutra would not have leased her Class Vehicle or would have paid less to do so.

58.    Plaintiff Moutra would lease or purchase a Class Vehicle from Volkswagen in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

**<u>Defendants</u>**

13

59.     Defendant VWAG is a German corporation with its principal place of business in Wolfsburg, Germany. VWAG is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles, including in New Jersey. VWAG is the parent corporation of VW America and Audi AG.

60.     Defendant VW America is a New Jersey corporation doing business throughout the United States. VW America's corporate headquarters is located in Herndon, Virginia. VW America is a wholly owned U.S. subsidiary of VWAG, and it engages in business activities in furtherance of the interests of VWAG, including the advertising, marketing and sale of VW automobiles nationwide, including in New Jersey.

61.     Defendant Audi AG is a German corporation with its principal place of business in Ingolstadt, Germany and is a wholly owned subsidiary of VW AG. Audi AG is the parent entity of Audi America. Audi AG designs, develops, manufactures, and sells luxury automobiles under the Audi brand name, including in New Jersey.

62.     Defendant Audi America is a Delaware corporation with its principal place of business located in Herndon, Virginia. Audi America is a wholly owned subsidiary of Audi AG and an operating unit of VW America. Audi America engages in business, including the advertising, marketing, and sale of Audi automobiles nationwide, including in New Jersey.

63.    At all relevant times, VW America and Audi America acted as authorized agents, representatives, servants, employees and/or alter egos of VW AG and Audi AG while performing activities including but not limited to advertising, warranties, warranty repairs, dissemination of technical information, and monitoring the performance of VW and Audi vehicles in the United States, including substantial activities that occurred within New Jersey and this District.

64.    At all times relevant to this action, Defendants manufactured, distributed, sold, and warranted the Class Vehicles under the VW and Audi brand names throughout the United States, including in New Jersey.

65.    Defendants and/or their agents designed, manufactured, and/or installed the Engines in the Class Vehicles. Defendants and/or their agents also developed and disseminated the owner's manuals and warranty booklets, USA Warranty and Maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles, all of which also occurred in New Jersey.

## FACTUAL ALLEGATIONS

### A.    Overview of the Defect

66.    The Engine operates by igniting air-fuel mixtures within cylinders, driving the pistons that turn the crankshaft and power the vehicle.

67.    Piston rings are mounted around the circumference of the pistons inside the Engine's cylinder.

15

68.    The top two piston rings create a tight seal between the piston and the cylinder wall, preventing the escape of combustion gases during the power stroke.

69.    This ensures maximum compression, which is critical for the turbocharged Engine to maintain its high-power output and fuel efficiency, as poor sealing will result in power loss and increased emissions.

70.    The third ring scrapes excess oil from the cylinder walls during the piston's downward stroke, ensuring that only a thin lubricating film remains. This prevents oil from entering the combustion chamber and being burned, which would result in increased oil consumption and emissions.

71.    Additionally, the oil control ring helps maintain a consistent lubricating oil film between the piston and cylinder wall, reducing friction and wear.

72.    As a result of design and/or manufacturing defects, the piston rings in the Engines wear and/or lack sufficient tension that compromises their ability to maintain proper contact with the cylinder wall, thereby allowing oil to pass into the combustion chamber where it burns, creating carbon buildup that, as alleged below, damages the PCV, causing a cascade of catastrophic events.

73.    First, the carbon buildup causes the PCV to stick, causing overpressurization in the crank case.

74.    The overpressurization presses against and damages seals and gaskets, including valve cover and timing chain seals and gaskets, and the plastic oil pan cover at the bottom of the vehicle.

75.    The overpressurization causes the seals and gaskets to fail, causing oil leaks and excess consumption, and cracks the plastic oil pan cover, causing substantial and continuous oil leaks.

76.    The Class Vehicles do not alert consumers that their crankcases are over pressurized.

77.    Instead, the only notification consumers receive is the low oil light after the damage is done.

78.    Second, the carbon buildup fouls sparkplugs, creating a loss of spark and combustion in one or more of the four cylinders, which affects engine performance and power, creating drivability issues.

79.    The Class Vehicles do not alert consumers that one or more of the Engines' spark plugs are fouled.

80.    Compounding all of this, the Class Vehicles were engineered to fail.

81.    Defendants recommend that its customers change their oil every 10,000 miles.[2]

---

[2] https://static.nhtsa.gov/odi/tsbs/2020/MC-10177239-0001.pdf

82.    Defendants also claim that its "normal" oil consumption rate is a .5 qt every 500 miles.

83.    The below table tracks oil consumption under Volkswagen's "normal" rate of oil consumption:

| Qts burned | Miles operated |
|---|---|
| .5 | 500 |
| 1 | 1,000 |
| 1.5 | 1,500 |
| 2 | 2,000 |
| 2.5 | 2,500 |
| 3 | 3,000 |
| 3.5 | 3,500 |
| 4 | 4,000 |
| 4.5 | 4,500 |
| 5 | 5,000 |
| 5.5 | 5,500 |
| 6 | 6,000 |

84.    The oil sump for a 2022 Volkswagen Atlas, for example, holds approximately 6 qts of oil.

18

85.     That means, under Defendants' own standards, the Class Vehicles will have consumed *all* of its oil with 4,000 miles left before an oil change is recommended. That is *not* normal.

86.     Defendants have not offered a remedy to eliminate or reduce the excessive consumption of oil, carbon buildup, crankcase overpressurization, or spark plug fouling.

**B.      Defendants' Knowledge of the Defect and Associated Safety Risks**

87.     Defendants fraudulently, intentionally, negligently, and/or recklessly concealed from Plaintiffs and Class Members the Defect in the Class Vehicles, even though Defendants knew or should have known of the design and/or manufacturing defects in the Class Vehicles.

88.     Defendants have long known about the Defect since at least 2017, having battled oil consumption issues since earlier versions of the Engine was released, as alleged below.

89.     Defendants' knowledge of the Defect stems from: pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Defendants' network of dealers and directly to Defendants, aggregate warranty data compiled from Defendants' network of dealers, testing conducted by Defendants in response to consumer complaints, repair order and parts data received by Defendants

from Defendants' network of dealers and suppliers, its investigation and field analysis of the Defect; and its investigation and root cause analysis of failures in pre-Class Vehicles.

### 1.    Pre-Release Testing

90.    Defendants knew or should have known about the Defect from the testing performed on the Engines and components. Prior to the sale of any of the Class Vehicles, Defendants–like any other reasonable Original Equipment Manufacturer ("OEM") seeking to manufacture and sell vehicles on the U.S. market–completed a multitude of analyses and testing that exposed the existence of the Defect.

91.    Defendants and their suppliers perform various pre-production testing on new vehicle components, including most notably dynamometer, bench, and computer simulation testing, Production Part Approval Process ("PPAP"), Failure Modes and Effects Analysis (FMEA), and Design Validation Plan and Report (DVP&R).

92.    PPAP is a framework of requirements used in the automotive supply chain to establish confidence in suppliers and their manufacturing processes.

93.    Defendants and their suppliers performed these tests, and others, on the Class Vehicles and, if performed with due care, demonstrated that the relevant systems or components in the Class Vehicles would lead to the Defect.

94.    Volkswagen performs PPAP testing as part of its Formel Q process.

95.    Volkswagen also performed FMEA testing as part of its Formel Q process.

96.    FMEA tests methods or modes by which a particular component might fail. It examines the design of each component, the assembly of the part, and whether use in various manners would cause the part or system to fail. For example, in testing the systems at issue here, FMEA explores, among other things, how and under what conditions the Engines and their components could fail, how likely failure was under different conditions, and how likely each condition tested was to occur.

97.    The purpose of the FMEA is to define, based on known and established engineering facts like those asserted by Defendants, potential risks of failures and rank them by severity, likelihood and ability to detect failure. Any conditions resulting in failure, like those associated with the Defect would result in a "high risk" priority and draw additional and more extensive analysis and validation testing during the FMEA and DVP&R phases. Given the reports of Engine failures after sale, these processes were designed to show the various modes of failure caused by the Defect and confirm what Defendants already knew about the Defect.

98.    Volkswagen also employs a DVP&R phase during the validation of its vehicles and components.

99.    The DVP&R phase includes tests and other work necessary to validate the robustness of any design and includes three basic types of testing: bench scale, dynamometer, and vehicle/field testing. This testing is discussed below.

100.    Bench scale testing is component-specific and establishes a strict set of specifications and guidelines to ensure that the component will operate reliably and durably in foreseeable operating conditions. During this phase of testing, Defendant's Engine was "bench tested," that is, set up on various machinery to simulate certain operating extremities and conditions to confirm whether it meets the necessary specifications and guidelines set by the supplier in coordination with Defendant. Defendants received the detailed results of the bench testing and resulting Technical Control Documents (TCDs) which outline the operating limitations of Defendant's Engine along with the potential risks associated with installation in the Class Vehicles, including the Defect. Similarly, bench testing of the Engines confirmed what Defendants already knew about its design choice or its workmanship and materials—that the Engines fail to operate as intended and prematurely fail.

101.    Dynamometer testing is one of the most important types of testing to ensure durability and performance of the powertrain and its components. In the dynamometer test, the powertrain operates under extreme conditions such as maximum temperatures, RPMs, or excessive vibration. Dynamometer testing is

22

intended to demonstrate powertrain robustness and reveal necessary improvements or flaws, such as the Defect. Dynamometer testing revealed the Engines were poorly designed and manufactured, suffered from premature degradation, underperformance, and, ultimately, catastrophic failure.

102.    Defendants and their suppliers also performed computer and real-world simulations of the systems, including in extreme conditions, to confirm they are meeting the design goals. Defendants tested the Engines in actual vehicles, both prototype vehicles and pre-production line vehicles. In these tests, vehicles are driven through a full range of conditions and extremities that are encountered once a vehicle is sold to the public. These vehicle-specific development tests include mapping extreme operating conditions, which are the kinds of modes that manifest the Defect.

103. Through the rigors of these three phases of DVP&R testing, Defendants' Engines were exposed repeatedly to conditions that cause the Defect to manifest.

104.    Defendants performed durability tests on the oil pan by subjecting it to stress conditions. These tests revealed that the oil pan did not hold up well and was likely to develop oil leaks, which could result in a loss of lubrication.

105.    Defendants exposed the Class Vehicles to extreme operating conditions, such as high temperatures and heavy loads. Under these conditions, the piston rings,

oil pan, spark plugs, PCV valve, and oil separator showed accelerated wear and fatigue, meaning these parts wore out faster than expected.

106.    Defendants also tested the Engine's oil delivery and circulation. These tests found that the Engine design did not provide enough oil to critical areas, leading to oil starvation. When the Engine did not receive enough oil, important components were not properly lubricated, resulting in metal-on-metal contact.

107.    Finally, the overall testing results indicated that the Class Vehicles' Engines grossly underperform and suffer internal component damage and failure. However, due to the costs of redesigning and fixing the Engines, Defendants opted to conceal the Defect.

## 2.    EA888 Engine Design Changes

108.    Defendants first introduced the EA888 engine family in 2007, when the first-generation 2.0L turbocharged Engine appeared in early Audi and Volkswagen models, including the Audi A3, which served as one of the initial platforms for EA888 deployment.

109.    This initial version introduced chain-driven timing and direct injection, but it was quickly replaced due to issues like oil consumption and cam follower wear.

110.    In 2009, the second generation EA888 was introduced, bringing a redesigned cylinder head and an integrated exhaust manifold that helped the Engine warm up faster and meet stricter emissions standards.

111.   This second generation 2.0L Engine was equipped in North American models such as the Passat B6/B7, CC, Mk6 GTI, the first-generation Tiguan, and the Jetta GLI Mk6, as well as Audi's B8 A4 and Q5.

112.   By 2013, Defendants launched the third generation EA888 globally, but North American vehicles did not adopt the third generation Engine until 2015.

113.   This generation became the predominant 2.0L turbocharged engine across the North American Volkswagen Group lineup. Volkswagen installed the Engine in the Mk7 GTI, Golf R, second-generation Tiguan, Atlas, and Passat, while Audi deployed it in the Audi A3, Audi A5 Q3, Q5, Audi Q7 models.

114.   The third generation Engine featured lighter internal components, an electronic wastegate for precise boost control, and an advanced Positive Crankcase Ventilation ("PCV") system built into the valve cover.

115.   Beginning in the 2018 model year, the second-generation Tiguan, Atlas, Passat, and Jetta GLI received the updated EA888 Gen 3B Engine, while Audi vehicles received corresponding incremental updates to their third generation EA888 Engines particularly in the A3, A5, Q3, Q5, and Q7.

116.   This version, sometimes called Gen 3B or Gen 3.3, added a modified Miller-cycle combustion strategy, with earlier intake valve closing to boost efficiency and torque, integrated gasoline particulate filters for emissions, and further improved thermal management and PCV design.

117. The PCV valve was redesigned for these models, moving to an integrated valve cover system with multi-stage oil separation to reduce oil consumption and improve emissions.

118. These updates were made to address common issues, some of which are related to Oil Consumption, found in earlier EA888 engines and are shared across all Class Vehicles. Yet, these updates failed to remedy the Defect.

119. The Class Vehicles' Engines, including all relevant components, are substantially similar in design, material composition, and functional characteristics.

### 3.    Technical Service Bulletins

120. Defendants are well aware of the existence of excessive oil consumption in its vehicles.

121. For example, on December 10, 2008, Volkswagen issued a Technical Service Bulletin ("TSB") No. 17-08-03 applicable to 2000-2010 model year vehicles with earlier versions of the Engine.

122. Volkswagen acknowledged customer complaints of high oil consumption that may exceed Volkswagen's oil consumption standard.

123. The TSB further states that "If the customer complains that their engine is apparently consuming oil in excess of the Volkswagen oil consumption standard above, an oil consumption test must be performed … ."

124. Volkswagen further requires its dealers to contact its Technical Assistance Center (TACS) to obtain authorization for an oil consumption related repair.

125. However, despite its knowledge of the Defect as evidenced by this TSB, under the "Product Solution" section, Volkswagen offers no solution, stating instead "Not applicable."

126. Given the time it takes Volkswagen to gather relevant data, compile relevant consumer complaints and investigate such engine oil consumption complaints, and then prepare and release the above TSB to its authorized dealerships, the December 10, 2008, TSB No. 17-08-03 establishes Volkswagen had knowledge of the Defect affecting the vehicles it sold accompanied by its express warranties prior to December of 2008.

127. On May 3, 2016, Audi issued TSB 17-16-73-2030197/16 acknowledging excessive oil consumption and crankcase overpressurization in 2009–2012 model year vehicles with earlier versions of the Engine.

128. Audi directed dealers to replace the crankcase-pressure regulating valve and perform mandatory multi-stage oil-consumption tests using Offboard Diagnostic Information System (ODIS) electronic measurement or the weighing method, further noting that a production change beginning in the 2013 model year addressed crankcase-pressure concerns.

27

129.    On November 5, 2020, Volkswagen issued a revised TSB No. 17-18-06, where it expanded the previous TSB's application from to cover Class Vehicles up to the 2021 model year vehicles equipped with the Engine.

130.    Volkswagen again acknowledged customer complaints of high engine oil consumption in TSB No. 17-18-06. In the updated bulletin, Volkswagen also instructs its dealers to inspect the engine for any signs for oil leaks before performing an oil consumption test.

131.    Volkswagen further requires its dealers to contact its Technical Assistance Center (TACS) to obtain authorization for an oil consumption related repair, but under the "Product Solution" section, Volkswagen offers no solution, stating instead "Not applicable."

132.    On March 14, 2022, Volkswagen again updated its TSB No. 17-18-06, and again expanded bulletin application, this time to add coverage up to model year 2022 vehicles with the Engine.

133.    On July 18, 2024, Audi issued TSB 01-24-30, applicable to nearly all Audi models from 2015–2025 with the Engine, addressing customer reports of increased engine-oil consumption despite no visible external leaks. Audi mandated the use of objective, standardized ODIS or weighing-method testing and required customers to acknowledge that diagnostic costs would be borne by them if consumption was found to be within Audi's specified limits.

134. That same day, Audi published companion TSB 2074640/1 (also covering 2015–2025 vehicles), reiterating that excessive-consumption complaints required electronic or weighed oil-consumption testing and again obligating dealers to secure signed customer acknowledgments regarding diagnostic charges. Audi provided no production remedy, instead treating consumption within Audi's thresholds as normal.

135. On September 18, 2024, Volkswagen again updated its TSB No. 17-18-06, and again expanded bulletin application, this time to include up to model year 2025 vehicles with the Engine.

136. Taken together, these official TSBs demonstrate Defendants' long-standing awareness of elevated engine-oil-consumption complaints over more than a decade, as well as Defendants' consistent practice of requiring standardized testing, limiting warranty coverage where consumption fell "within specification," and declining to provide broader corrective action despite widespread customer reports.

137. Despite being on notice that the Class Vehicles suffered from the Defect and issuing acknowledgments of the Defect through its various TSBs, Defendants failed to disclose the existence of the Defect to Plaintiffs or any other Class Vehicle owners.

### 4.    Consumer complaints to NHTSA

138.   Defendants regularly monitor NHTSA complaints to meet reporting requirements under federal law. Defendants, therefore, have and had knowledge of the Defect due to the numerous consumer complaints, such as those made to NHTSA, as well as by other means, since at least 2008.

139.   Defendants "monitor[] the field" and launch investigations after receiving oil consumption/oil leak complaints.[3]

140.   Below are examples of complaints filed with NHTSA by owners of Volkswagen Class Vehicles concerning the Defect.[4]

141.   On January 2, 2018, the owner of a 2018 Volkswagen Atlas submitted the following complaint to NHTSA:[5]

> EXCESSIVE OIL CONSUMPTION. USED 1AND 1/2 QUARTS OF OIL AT 3250 MILES(WHICH WAS ADDED BY THE DEALER SERVICE DEPT. TODAY 1/2/18) WAS BOUGHT AS A NEW VEHICLE 9/17 WITH ONLY 12 MILES ON ODOMETER.(12/25/17) FIRST THE CHECK ENGINE LIGHT LIT, THEY SAID IT WAS THE GAS CAP.ONE WEEK LATER THE CHECK OIL LEVEL ALARM LIT . THEY CHECKED IT SAID NO EXTERNAL LEAKS, THEY ADDED THE 1 1/2 QUART OIL , SAID TO KEEP AN EYE ON THE LEVEL. I AM SCARED TO TAKE THIS CAR ON ANY TRIPS WITH THIS CAR. ALSO THE COOLANT LEVEL WAS AT THE MINIMUM LEVEL, THE SERVICE OPEN THE CAP AND THE LEVEL DID RISE, BUT WHY IS THAT?

---

[3] https://static.nhtsa.gov/odi/rcl/2025/RMISC-25V294-6161.pdf
[4] All font, grammar, and typographical errors in the NHTSA complaints are original.
[5] NHTSA ID: 11058104.

142.    On June 14, 2018, the owner of a 2018 Volkswagen Tiguan submitted

the following complaint to NHTSA:[6]

> MY EVERYDAY EXPERIENCE WITH THIS VEHICLE
> INCLUDES - HESITATION WHEN ACCELERATING QUICKLY,
> JERKING FORCEFULLY WHEN ACCELERATING SLOWLY,
> RANDOM JERKING WHILE DRIVING. IT SEEMS AS THOUGH,
> EVEN AS AN AUTOMATIC CAR, I CAN FEEL EVERY GEAR
> CHANGE. ESPECIALLY ON THE FREEWAY, I FEEL
> EXTREMELY UNSAFE WHEN I ATTEMPT A LANE CHANGE.
> WHEN I PUT MY FOOT ON THE GAS TO QUICKLY SPEED UP,
> MY VEHICLE HESITATES AND DOES NOT MATCH WHAT I
> AM DOING ON THE PEDAL. THE HESITATION IS ESPECIALLY
> DANGEROUS FOR OTHER VEHICLES ON THE ROAD. I AM
> EXTREMELY ANXIOUS WHEN DRIVING MY VEHICLE
> BECAUSE I DO NOT FEEL IN CONTROL. I WORRY THAT, AT
> ANY POINT, IT WILL HESITATE OR JERK FORCEFULLY, AND
> CAUSE HARM TO ME, MY PASSENGERS, AND/OR THOSE IN
> OTHER VEHICLES AROUND ME. PLEASE NOTE THAT THIS IS
> AN ONGOING PROBLEM. THIS WAS NOT A ONE-TIME
> OCCURRENCE. THIS DOES NOT JUST OCCUR WHEN DRIVING
> AT CERTAIN SPEEDS. THE HESITATION AND JERKING
> OCCUR DAILY.

143.    On July 26, 2018, the owner of a 2018 Volkswagen Tiguan submitted

the following complaint to NHTSA:[7]

> ENGINE OIL WILL LEAK FROM INTAKE CAMSHAFT
> ADJUSTMENT VALVE. LEAK WAS NOTICED FIRST WHEN
> PARKED. AFTER FIRST REPAIR BY DEALER (11 JULY 2018), IT
> STARTED TO LEAK AGAIN ONLY AFTER FIVE DAYS FROM
> REPAIR. THIS REPRESENTS A SAFETY ISSUE THAT MAY
> CAUSE A FIRE OR EVENTUALLY ENGINE TO FAIL. CAN
> PROVIDE REPAIR REPORT FROM DEALER (FIRST REPAIR)
> AND SECOND ONCE IT IS FINALIZED. THANK YOU.

---

[6] NHTSA ID: 11101901.
[7] NHTSA ID: 11111789.

144.   On September 14, 2018, the owner of a 2018 Volkswagen Atlas submitted the following complaint to NHHTSA:[8]

> 2ND ATTEMPT AT REPAIRING OIL LEAK OCCURRING FROM ENGINE BAY LOCATED AROUND OIL FILTER HOUSING ON LEFT SIDE OF ENGINE. WAS NOT PROPERLY TORQUED FROM FACTORY ON FIRST OCCURRENCE HOUSING COULD BE TURNED WITH A WRENCH. THE SECOND OCCURRENCE TOOK 2 MONTH AFTER OIL CHANGE TO SHOW SAME SYMPTOMS. THIS OCCURS UNDER ALL CONDITIONS AND VEHICLE RARELY SEES DIRT ROADS.

145.   On December 7, 2018, the owner of a 2018 Volkswagen Passat submitted the following complaint to NHTSA:[9]

> MY CAR IS UNDER 7000 MILES, DON'T EVEN HAVE THE FIRST SCHEDULE OIL CHANGE AND EXPERIENCE EXCESSIVE OIL CONSUMPTION. I HAVE TAKEN IT TO THE CAR DEALER AND JUST TOP OFF THE OIL. SOMETHING IS WRONG WITH THE ENGINE.

146.   On January 25, 2019, the owner of a 2018 Volkswagen Tiguan submitted the following complaint to NHTSA:[10]

> VEHICLE HAS A SIGNIFICANT HESITATION WHEN STARTING FROM A STOPPED POSITION. WHEN PULLING INTO TRAFFIC YOU STEP ON THE GAS AND INITIALLY THE VEHICLE DOES NOT MOVE WHICH CAUSES YOU TO PRESS FURTHER ON THE ACCELERATOR PEDAL. EVENTUALLY VEHICLE SUDDENLY JERKS VIOLENTLY FORWARD. DEALERSHIP ADVISES THAT SINCE THERE ARE NO TROUBLE CODES THERE IS NOTHING WRONG. HAS BEEN AN ISSUE SINCE NEW.

---

[8] NHTSA ID: 11129484.
[9] NHTSA ID: 11156844.
[10] NHTSA ID: 11172162.

147.   On September 7, 2021, the owner of a 2021 Volkswagen Atlas submitted the following complaint in NHTSA:

> About two weeks after purchasing my brand new VW Atlas Cross Sport 2021 (purchased March of 2021) the dash board warning systems have not properly worked. The screen constantly freezes and occasionally a warning appears for vehicle collision assistance when nothing is in front of me. The tire pressure light randomly comes on but the tires are always at the proper PSI. The auto start/stop will malfunction, the car will stop running to save power automatically at a red light but occasionally it gets confused and starts/stops over and over or will not start back up at all when I put pressure on the gas pedal like it should. Yesterday, 9/6/2021, the vehicle overheated after driving it for 2 hours. The odometer was at 4,001 miles. Pulled over and opened the hood and the engine was completely out of oil and antifreeze. No check engine light or low oil pressure light ever came on. The low coolant light came on but only after the vehicle began to overheat. A mechanic who pulled over to help us stated that it was so low that it's a miracle the vehicle did not catch on fire. He stated the fluids must of come low from the dealership but that the operating syatem is supposed to warn me well ahead of time but it did not. The manual recommends 7,000 to 10,000 miles for an oil change, the vehicle just hit 4,000 miles. No warning or check engine light warning until after the emergency occurs is NOT OKAY![11]

148.   The above complaints represent a sample of those submitted to NHTSA and Defendants.

### 5.     Warranty Data

149.   Defendants also knew about the Defect from its warranty data.

---

[11] NHTSA ID: 11431956

150.   Per the TREAD Act, Defendants track customer complaints, vehicle diagnoses, and repairs from dealership technicians in a single, aggregated database.[12]

151.   Defendants employ persons who monitor the database for repair trends, and engineering and management staff review such trends in regular meetings.

152.   For every one complaint filed with NHTSA, Defendants receive hundreds or thousands of related warranty claims.

153.   Accordingly, Defendants have likely received thousands of Defect warranty claims from the start of production.

C. **Defendants Actively Concealed the Defect and Made Misleading Partial Disclosures Which Create a Duty to Disclose**

154.   Despite its pre-sale knowledge of the Defect, Defendants knowingly manufactured, marketed, and sold the Class Vehicles and their defective Engines while willfully concealing the Defect from Class Members and Plaintiffs.

155.   Defendants omitted material facts including the standard, quality or grade of the Class Vehicles. Specifically, Defendants omitted the fact that the Engines in the Class Vehicles are defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks.

156.   Due to Defendants' conduct, Class Members have suffered actual damages.

---

[12] https://one.nhtsa.gov/nhtsa/announce/testimony/tread.html

157.   Defendants owed a duty to disclose the Defect and its corresponding safety risk to Plaintiffs and Class Members because Defendants made non-puffery, partial material statements about the Class Vehicles, possessed superior and exclusive knowledge regarding the Defect and the risks associated with the Engine's failure, and falsely and misleadingly marketed Class Vehicles.

158.   Defendants held out the Class Vehicles as having superior engineering and performance,[13] despite its knowledge that the Defect represented a flaw that rendered the Class Vehicles short of industry standards for engineering and substantially impaired the Class Vehicles' performance and life expectancy.

159.   Defendants developed sales and marketing materials, including on the Defendants' websites that included no references to or notice about the Defect.

160.   Defendants' concealment of the Defect in light of the partial disclosures made in their marketing and sales materials render those partial disclosures misleading and false.

161.   For example, in a September 29, 2017 press release, Hinrich J. Woebcken, President and Chief Executive Officer of Volkswagen Group of America stated that it "stands behind its quality and workmanship."

---

[13] *See*, for example, https://cdn.dealereprocess.org/cdn/brochures/volkswagen/2021-atlas.pdf.

162.    In the same press release, Mr. Woebcken also stated that "Volkswagen has always been 'the people's car,' and with the People First Warranty, we're putting our customers first."

163.    In a sales brochure for the model year 2022 Passat, Volkswagen touted the Engine stating it "gives your Passat plenty of get up and go—and up to 36 miles to the gallon." It also advertises and provides detailed specifications about the Engine without disclosing the Defect.

164.    In a November 2022 self-study, Volkswagen touted the EA888 engine as "modified to reduce emissions further and provide even better performance."

165.    Defendants' marketing materials and dealer-distributed brochures are centrally developed and approved by Defendants before release. Defendants require their network of dealerships to use those materials, ensuring a uniform nationwide message. Dealers were never provided information about the Defect and were instead instructed to reassure customers that the Engine erratic behavior and excessive oil consumption was "normal operation."

166.    Through this coordinated marketing, Defendants created and perpetuated a false impression that the Class Vehicles offered exceptional reliability, performance, and safety.

167.    In reality, the Class Vehicles contained a latent Defect that caused oil starvation, engine damage, and sudden loss of power—conditions fundamentally inconsistent with Defendants' core brand promises.

168.    As a result of these uniform misrepresentations and omissions, Plaintiffs and Class Members purchased or leased Class Vehicles they reasonably believed were safe and dependable, when in fact Defendants knew they were defective, unsafe, and unfit for their ordinary purpose.

169.    Defendants' representations and omissions were material to reasonable consumers.

170.    Safety, reliability, and performance are core considerations in the purchase of any vehicle, and Defendants' branding is built on those precise attributes.

171.    Consumers reasonably expect that a manufacturer advertising "quality," "dependability," and "safety" has disclosed known defects that pose a risk of drivability failure or loss of power and Plaintiffs and Class members could not reasonably discovery the Defect on their own prior to purchasing or leasing their vehicles.

172.    Plaintiffs saw or heard these partial statements – or statements Defendants made or caused to be made substantially similar to these – quantifying the Class Vehicles' operational specifications as part of their purchasing research.

173.   Defendants' partial statements caused Plaintiffs to purchase the Class Vehicles without full knowledge of the Defect.

174.   Plaintiffs placed their trust in Defendants to give them all the details necessary to make an informed purchase decision, but Defendants provided only partial disclosure of facts basic to the transaction – i.e., Defendants failed to disclose that the Class Vehicles contained the Defect.

175.   Defendants' detailed partial statements about the capabilities of the Class Vehicles, including, but not limited to those set forth above, were available to Plaintiffs and consumers – putative class members – on, *inter alia*, Defendants' websites and in popular and relevant on-line websites that reported news about the Class Vehicles prior to Plaintiffs' purchases of their Class Vehicles.

176.   The same partial statements are still on the Internet today, fully accessible to those Class Members who purchased their used Class Vehicles later in time than Plaintiffs, or consumers who purchased their Vehicles even more recently, or even those who are currently planning to purchase a Class Vehicle.

177.   Defendants have not removed the misleading partial statements, have not clarified them, and have not disclosed the Defect.

178.   As a result of Defendants' failure to disclose to Plaintiffs and Class Members the material fact that the Engine in Class Vehicles is defective and prone to premature failure, owners and lessors of the Class Vehicles are required to spend

thousands of dollars repairing or replacing the Engine or its components or selling their vehicles at a substantial loss.

179.   Defendants also owed a duty to disclose the Defect and its corresponding safety risk to Plaintiffs and Class Members because Defendants made misleading and/or ambiguous partial statements about the nature and quality of the Engines installed in the Class Vehicles and Plaintiffs and Class Members reposed trust in Defendants to provide full and complete information or otherwise to correct incomplete or misleading partial statements.

180.   Moreover, based on their knowledge of the Defect, Defendants were in a superior position as to Plaintiffs to make their incomplete and partial statements about the Class Vehicles complete.

181.   Oil consumption, oil leaks, poor engine performance, and premature failure of the Engine are material because no reasonable consumer expects that he or she will have to spend thousands of dollars for diagnosis, repair or replacement of the Engine before the expected life of the vehicle.

182.   Plaintiffs and Class Members had a reasonable expectation that the Class Vehicles would not suffer from a premature failure of the Engine.

183.   Premature failure of the Engine is also material because it presents a safety risk and places the driver and occupants and members of the public at risk of serious injury or death.

184.    Drivers and occupants of the Class Vehicles are at risk of accidents or being stranded on the roadside.

185.    Plaintiffs and Class Members reposed trust and confidence in Defendants.

186.    In their respective purchase transactions, Plaintiffs lacked any knowledge of the Defect while Defendants knew about the Defect and the Defect's implications for the use and enjoyment of the Class Vehicles, not to mention their value.

187.    Under these circumstances, based on the nature of the dealings, including Defendants' partial disclosures and the vast difference in knowledge of the Defect between Plaintiffs and Defendants, Defendants had a duty of full disclosure.

188.    Had Defendants disclosed the existence and extent of the Defect Plaintiffs would not have purchased their vehicles or purchased them for a lower price.

   **D.    <u>The Defect is a Serious Safety Risk that Defendants have not fixed.</u>**

189.    The Defect reduces engine power, damages engines, and leaves Class members stranded.

190.    For example, on November 27, 2023, the owner of a 2017 Audi Q7 submitted the following complaint in NHTSA:

> We purchased a 2017 Q7 with low milage. At around 75k miles the engine started consuming oil every 1,200 miles, when previously it

never required an oil change before the regularly scheduled service. The dealer always said "that is 'in spec'". This went on for over a year. Then, when we were driving cross-country for thanksgiving in 2022, the engine made a major concussive noise and we lost power while driving on the freeway at around 70mph. This almost caused a high speed collision. It was winter and we had the entire family in the car. we took it to the dealership, and the service tech recommended a compression test and borescope. No carbon build-up was found. Pressure was 'ok' in all cylinders. There were codes showing a fuel injector misfire, so the dealer recommended replacing all of them. The repair was done, but we've continued to have excessive oil consumption, the engine continues to run rough, and we occasionally get 'drive system malfunction' errors. When driving cross country in sub-freezing winter weather, last week, the engine lost power again. I stopped at the nearest Audi service center two hours later, and the tech found that the spark plugs had significant carbon fouling. Spark plugs were replaced. Engine continues to consume too much oil. Based on my research, it appears that this is a known issue, with several class action lawsuits. The Q7 does not appear to be part of these suits (yet), but there are posts and forums all over the internet with owners reporting this problem.[14]

191.    On September 18, 2024, the owner of a 2022 Volkswagen Atlas submitted the following complaint in NHTSA:

I discovered my car was leaking a small amount of oil on 08/26/2024. I made a service appointment to get it looked at and found out that the crank case oil separator and the upper timing case were both leaking. These were both found at my local Volkswagen Dealership. I was told to continue driving it but to check my oil levels weekly. On 09/14/2024, I put oil in my car that morning and at 4:30pm my car was smoking, and my oil cap had exploded off from pressure. This caused my car to no longer be safe to drive. No warning lights came on until after the leaks were found then it caused an error with my start-stop which when brought in to be inspected was told this is all related to the issue with the oil leaks.[15]

---

[14] NHTSA ID: 11556955
[15] NHTSA ID: 11615140

192.   On May 3, 2025, the owner of a 2018 Audi Q7 submitted the following complaint in NHTSA:

> The engine burns oil. At about 60k miles started to burn about a liter every 10k miles. Once the engine got to about 80K engines it started burning a leter about every 1K miles. The high amount of oil consumption fouled the spark plugs, coils, injectors and sensors. This resulted in a drive system malfunction, caused loss of power in the engine that ultimately ruined the engine with less than 100K miles.[16]

193.   Even more, Volkswagen has not fixed the underlying issue and its repair is not effective, as many Class members report post-repair failures.

194.   For example, on October 16, 2022, the owner of a 2018 Audi Q3 submitted the following complaint in NHTSA:

> The vehicle is burning and consuming too much oil too quickly between oil changes. Oil pressure light keeps turning off and on even when there is oil. Vehicle has been serviced and worked on by Audi dealership. Currently vehicle is at Audi for exact same issues after Audi claimed to fix it. Vehicle had to be taken back to the dealer for repairs within 30 minutes after picking up the vehicle from dealership for the same light. Paid $2300 for the first time I took the car in for repairs and I had to take it back cause nothing was fixed[17]

195.   On February 3, 2025, the owner of a 2016 Audi Q3 submitted the following complaint in NHTSA:

> Had pistons and rings replaced by Audi dealership. After repairs were completed my car was burning through excessive amounts of oil. The engine seized while I was driving on highway. A replacement engine was installed after that by Audi. Now have clusters lights on dash after picking up car from the dealership. My car was not listed in class action

---

[16] NHTSA ID: 11658678
[17] NHTSA ID: 11489429

lawsuit. I want to know why? When all of the repairs were what was in the lawsuit.[18]

196.   On October 7, 2025, the owner of a 2023 Volkswagen Atlas submitted

the following complaint in NHTSA:

Complaint Summary: The PCV valve (oil separator, part number 06Q103495F) has failed twice within 20,000 miles on my 2023 Volkswagen Atlas 2.0T. The first failure occurred around 50,000 miles and was repaired under warranty. The second failure happened around 70,000 miles, after warranty expiration. Description of Issue: In both cases, the failure was identified when the low engine oil warning light appeared, followed by visible oil leakage across the top of the engine and the catch plate area. Upon inspection, oil was found covering surrounding components, and the dealer confirmed the PCV assembly had failed and was leaking internally and externally. The PCV system is integrated into the valve cover, and when it fails, it causes crankcase pressure loss, oil blow-by, and potential engine damage or fire risk if oil contacts hot components. This is not normal wear; it's a known recurring failure on EA888 2.0T engines used across multiple VW models. Safety Concern: A leaking PCV valve can cause: •Excessive oil consumption •Oil spray onto engine components, posing a potential fire hazard •Unstable idle or stalling due to vacuum imbalance •Risk of engine damage if crankcase pressure rises The part has been revised multiple times by Volkswagen but continues to fail prematurely. The lack of a recall or warranty extension leaves owners paying for repeated replacements of a defective component. Request: I urge NHTSA to investigate widespread premature failures of the PCV/Oil Separator assembly (06Q103495F and superseding parts) on Volkswagen EA888 Gen 3 engines used in the Atlas, Tiguan, and other VW/Audi vehicles. This appears to be a design flaw rather than a normal maintenance issue and could lead to oil fires or mechanical damage if ignored.[19]

---

[18] NHTSA ID: 11640285
[19] NHTSA ID: 11691958

197.    The above complaints represent a sampling of those submitted to NHTSA and Defendants.

**E.    Defendants Received Pre-Suit Notice Multiple Times and in Multiple Ways**

198.    Plaintiff Reece sent notice on November 14, 2025, on behalf of herself and all others similarly situated.

199.    Moreover, Defendants possessed comprehensive and exclusive awareness of the Defect, as previously outlined above. Furthermore, due to Defendants' thorough understanding of the Defect, its concealed nature, and Defendants' proven inability to address it, any further requirement for notice would be pointless.

**F.    Applicable Warranties**

200.    Defendants issued a New Vehicle Limited Warranty for the Class Vehicles. Defendants issued their Limited Warranty for the benefit of Plaintiffs and Class Members, and for the purpose of persuading Plaintiffs and Class Members to purchase the Class Vehicles.

201.    Defendants provide these warranties to buyers and lessees after the purchase/lease of the Class Vehicles is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

202.   The Class Vehicles sold and leased by Volkswagen included a written express warranty, which provides a 6-year/72,000-Mile New Vehicle Limited Warranty.

203.   The Class Vehicles sold and leased by Audi included a written express warranty, which provides a 5-year/50,000-Mile New Vehicle Limited Warranty.

204.   Defendants instruct vehicle owners and lessees to take their Class Vehicles to a Volkswagen or Audi-certified dealership for warranty repairs. Many owners and lessees have presented their Class Vehicles to Volkswagen or Audi-certified dealerships with complaints arising from the Defect and have been denied a free repair.

205.   Defendants have evaded their warranty obligations by (1) failing to tell consumers that the Class Vehicles are defective, and (2) refusing to perform and/or failing to timely issue adequate repairs to correct the Defect.

206.   Moreover, Defendants' warranties fail of their essential purpose because the company has failed to offer an effective and permanent repair for the Defect. Rather, Defendants simply replaces defective components with equally defective components and fails to correct and/or properly diagnose the underlying cause.

207.   Defendants have notice of their breach and fraud based on their actual and exclusive knowledge of the Defect.

208. Moreover, Defendants' failure to effectively repair the Defect makes notice or presentment requirements futile.

209. Both warranties are applicable to the Defect; however, Defendants have failed to correct the issue.

210. Under the terms of the New Vehicle Limited Warranty, Defendants are required to cover "any repair to correct a defect in manufacturer's material or workmanship."

211. Each Class Vehicle's original Engine is included in the New Vehicle Limited Warranty.

212. The New Vehicle Limited Warranty period begins once "[t]he vehicle is delivered to either the original purchaser or the original lessee."

213. Buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

214. Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect.

215. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and other Class members.

216.    Among other things, Plaintiffs and other Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.

217.    A gross disparity in bargaining power existed between Defendants and other Class Members, and Defendants knew of the Defect at the time of sale.

## TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

218.    Plaintiffs and the other Class Members could not have discovered through the exercise of reasonable diligence that their Class Vehicle was defective within the time period of any applicable statutes of limitation.

219.    Neither Plaintiffs nor the other Class Members knew or could have known of the Defect in their Class Vehicles.

### B.    Fraudulent Omission Tolling

220.    Throughout the time period relevant to this action, Defendants concealed from and failed to disclose to Plaintiffs and the other Class Members vital information about the Defect described herein.

221.    Indeed, Defendants kept Plaintiffs and the other Class Members ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiffs nor the other Class Members could have discovered the defect, even upon reasonable exercise of diligence.

222.   Specifically, since at least 2016, Defendants have been aware that the Engines installed in the Class Vehicles were defective.

223.   Despite its knowledge of the Defect, Defendants failed to disclose and concealed, and continues to conceal, this critical information from Plaintiffs and the other Class Members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

224.   Defendants affirmatively and actively concealed the Defect when it continued marketing the Class Vehicles and introducing new vehicles with this Engine, despite knowing that it was defective.

225.   Plaintiffs and the other Class Members justifiably relied on Defendants to disclose the Defect in the Class Vehicles that they purchased or leased, because that defect was hidden and not discoverable through reasonable efforts by Plaintiffs and the other Class Members.

226.   Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class Members have sustained as a result of the defect, by virtue of the fraudulent concealment doctrine.

**C.    Estoppel**

227.   Defendants knew about the Defect since at least 2016.

48

228.    However, Defendants did not disclose the Defect to Plaintiffs or the other Class Members, nor did Defendants warn Plaintiffs and Class Members of the dangers of the Defect.

229.    Instead, Defendants continued to mass-market the Class Vehicles solely for the purpose of generating revenues for Defendants' benefit.

230.    Defendants still have not released a countermeasure to remedy the Defect.

231.    Because of Defendants' unwillingness to provide adequate repairs, Plaintiffs and Class Members were led to believe that no problem existed or that the issue was resolved, only to find out it would later fail again. Defendants were merely replacing defective components with other equally defective components, rather than eliminating the Defect for good.

232.    Defendants were under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the Class Vehicles.

233.    Defendants knowingly concealed the true nature, quality, and character of the Class Vehicles.

234.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## **CLASS ALLEGATIONS**

235.    Plaintiffs seek to represent a Nationwide Class ("Nationwide Class")

defined as:

> All persons who purchased or leased a Class Vehicle (as defined herein) in the United States, the District of Columbia, Puerto Rico, and all other United States territories and/or possessions.

236.    Plaintiffs also bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following statewide classes:

> Alabama Class: All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in Alabama.

> Massachusetts Class: All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in Massachusetts.

> Texas Class: All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in Texas.

237.    Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment or amended complaint or narrowed at class certification.

238.    Excluded from the Classes are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

239.    This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of

Civil Procedure.

240. **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**. The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While Plaintiffs is informed and believe that there are thousands of Class Members, the precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendants' books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

241. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

        a.     whether Defendants engaged in the conduct alleged herein;

        b.     whether Defendants' alleged conduct violates applicable law;

        c.     whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

        d.     whether Defendants misled Class Members about the quality of the Class Vehicles;

    e.    whether the Class Vehicles contain the Defect;

    f.    whether Defendants had actual or imputed knowledge about the alleged defect but failed to disclose it to Plaintiffs and the other Class Members;

    g.    whether Defendants' omissions and concealment regarding the quality of the Class Vehicles were deceptive in violation of state consumer protection laws;

    h.    whether Defendants breached its express warranty to the Class Members with respect to the Class Vehicles;

    i.    whether Class Members overpaid for their Class Vehicles as a result of the Defect alleged herein;

    j.    whether Class Members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

    k.    the amount and nature of relief to be awarded to Plaintiffs and the other Class Members.

242. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class Members' claims because Plaintiffs and the other Class Members purchased or leased Class Vehicles with a uniform defect. Neither Plaintiffs nor the other Class Members would have purchased the Class

Vehicles, or would have paid less for the Class Vehicles, had they known of the Defect in the Class Vehicles. Plaintiffs and the other Class Members suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged. Plaintiffs 'claims arise from the same practices and course of conduct that give rise to the claims of the other Class Members.

243. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes that they seek to represent, Plaintiffs has retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

244. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members as a whole.

245. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the Class Members to individually seek redress for Defendants' wrongful conduct. Even if the Class Members could afford litigation the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

**Nationwide Class**

## COUNT 1
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

246.   Plaintiffs Reece, Ponder, Ferrara, and Moutra ("Plaintiffs" for purposes of this Count) incorporate and reallege each preceding paragraph as though fully set forth herein.

247.   Plaintiffs bring this count on behalf of themselves and the other Class Members.

248.   Plaintiffs and the Class Members are "consumers" within the meaning

54

of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

249.   Volkswagen is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5).

250.   Audi is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5).

251.   The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

252.   Defendants marketed the Class Vehicles as safe, built to last, and reliable vehicles. Such representations formed the basis of the bargain in Plaintiffs and the other Class Members' decisions to purchase or lease the Class Vehicles.

253.   In connection with the purchase or lease of each of the Class Vehicles, Defendants provided warranty coverage for the Class Vehicles under one or more manufacturers' warranties. For illustrative purposes, all new Volkswagen vehicles are covered by a 6-year/72,000-Mile New Vehicle Limited Warranty and all new Audi vehicles are covered by  4-year/50,000-Mile New Vehicle Limited Warranty Under warranties provided to Plaintiff and the other members of the Class, Defendants promised to repair or replace defective Engines and/or components arising out of defects in materials and/or workmanship, such as the Defect, at no cost to owners or lessors of the Class Vehicles.

254.    Defendants' warranties formed part of the basis of the bargain that was reached when Plaintiffs and the other Class Members purchased or leased their Class Vehicles. The affirmations of fact and/or promises made by Defendants in the warranties are express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiffs and the members of the Class on the one hand and Defendants on the other.

255.    Despite the existence of the warranties, Defendants failed to inform Plaintiffs and the other Class Members that the Class Vehicles contained the Defect, and, thus, wrongfully transferred the costs of repair or replacement of the Engines to Plaintiffs and the other Class Members.

256.    Defendants have failed to provide Plaintiffs or the other members of the Class with a meaningful remedy for the Defect, in clear breach of the express warranty described above, promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts they supplied.

257.    Plaintiffs and the Class Members performed all conditions precedent under the contract between the parties.

258.    As described above, Defendants were provided pre-suit notice of the Defect, and as such have been afforded a reasonable opportunity to cure their breach of written warranties. Any additional time to do so would be unnecessary and futile because Defendants have known of and concealed the Defect and, on information

and belief, have refused to repair or replace the Engines free of charge despite the Defect's existence at the time of sale or lease of the Class Vehicles.

259.   Defendants are in privity with Plaintiffs and members of the Class. Plaintiffs and Class Members, not the dealers, were the intended beneficiaries of Defendants' Class Vehicles and the associated written warranties. Defendants designed and manufactured the Class Vehicles, and created the advertising, marketing, and representations at issue and warranted the Class Vehicles to Plaintiffs and members of the Class directly and/or through the doctrine of agency. Defendants' sale of the Class Vehicles was through authorized dealers. Purchase or lease through authorized dealers is sufficient to create privity because such authorized sellers are Defendants' agents for the purpose of the sale and lease of the Class Vehicles. Further, Defendants knew the identity, purpose and requirements of Plaintiffs and members of the Class and designed, manufactured and marketed the Class Vehicles to meet their requirements.

260.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

261.   Defendants have been afforded a reasonable opportunity to cure their breach of the written warranties and/or Plaintiffs and the other Class Members were

not required to do so because affording Defendants a reasonable opportunity to cure their breach of written warranties would have been futile. Defendants were also on notice of the alleged defect from the complaints and service requests it received from Class Members, as well as from their own warranty claims, customer complaint data, and/or parts sales data.

262.  As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial.

263.  Finally, because of Defendants' breach of express warranty as set forth herein, Plaintiffs and the other members of the Class assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other Class Members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential

**Alabama Class**

## COUNT 2
**VIOLATIONS OF ALABAMA'S DECEPTIVE TRADE PRACTICES ACT**
**ALA. CODE §§ 8-19-1 *et seq.***
**(Individually and on behalf of the Alabama Class)**

264.  Plaintiffs Reece and Ponder ("Plaintiffs" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

265. Plaintiffs bring this claim individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

266. The Alabama Deceptive Trade Practices Act, Ala. Code. § 8-19-5, prohibits "[e]ngaging in . . . unconscionable, false, or deceptive act[s] or practice[s] in business, commerce, or trade."

267. By the conduct described in detail above and incorporated herein, Defendants engaged in deceptive trade practices.

268. Defendants' omissions regarding the Defect, described above, which causes the Engine to prematurely fail, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

269. Defendants intended for Plaintiffs and the other Class Members to rely on the omissions regarding the Defect.

270. Plaintiffs and the other Class Members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described, as evidenced by Plaintiffs and the other Class Members' purchases of Class Vehicles.

271. Had Defendants disclosed all material information regarding the Defect to Plaintiffs and the other Class Members, Plaintiffs and the other Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

272. Defendants' omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

273. Defendants were provided notice of the Defect as alleged in detail herein.

274. Defendants have not remedied their breach.

275. Further, Defendants have refused to provide an adequate and timely warranty repair for the Defect, thus rendering the satisfaction of any notice requirement futile. Customers that have presented their vehicles for warranty repair due to Engine failure have been denied adequate repairs.

276. As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs and the other Class Members have suffered ascertainable loss and actual damages. Plaintiffs and the other Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Defect been disclosed. Plaintiffs and the other Class Members also suffered diminished value of their vehicles. Plaintiffs and the other Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Ala. Code. §§ 8-19-1, *et seq.*

## COUNT 3

## BREACH OF EXPRESS WARRANTY
## ALA. CODE §§ 7-2-313 AND 7-2A-210
### (Individually and on behalf of the Alabama Class)

277.   Plaintiffs Reece and Ponder ("Plaintiffs" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

278.   Plaintiffs bring this claim individually and on behalf of the other members of the Alabama Class (the "Class" for purposes of this Count).

279.   Defendants are merchants with respect to the Class Vehicles.

280.   In its written express warranties, Defendants expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

281.   Defendants' written express warranties formed the basis of the bargain that was reached when Plaintiffs and the other Class Members purchased or leased their Class Vehicles.

282.   Defendants breached its express warranty to repair defective parts in the Class Vehicles. Defendants admittedly have not repaired the Class Vehicles' Defect.

283.   Defendants were provided notice of the Defect as alleged in detail herein.

284.   Defendants have not remedied their breach.

285.    Further, Defendants have refused to provide an adequate and timely warranty repair for the Defect, thus rendering the satisfaction of any notice requirement futile. Customers that have presented their vehicles for warranty repair due to Engine failure have been denied adequate repairs.

286.    The written express warranties fail of their essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class Members whole and because Defendants have failed and/or has refused to adequately provide the promised remedies within a reasonable time.

287.    Accordingly, recovery by Plaintiffs and the other Class Members is not limited to the limited remedy of repair, and Plaintiffs, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

288.    Also, as alleged in more detail herein, at the time that Defendants warranted and sold the Class Vehicles they knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Defendants improperly concealed material facts regarding their Class Vehicles. Plaintiffs and the other Class Members were therefore induced to purchase or lease the Class Vehicles under false pretenses.

289.    As a direct and proximate result of Defendants' breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT 4

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### ALA. CODE §§ 7-2-314 AND 7-2A-314
### (Individually and on behalf of the Alabama Class)

290.   Plaintiffs Reece and Ponder ("Plaintiffs" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

291.   Plaintiffs bring this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

292.   Defendants are merchants with respect to motor vehicles under Ala. Code § § 7-2-104 and 7-2A-103.

293.   Pursuant to Ala. Code §§ 7-2-314 and 7-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

294.   The Class Vehicles do not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Defect which causes the Class Vehicles' Engine to prematurely fail.

295.   Defendants were provided notice of the Defect as alleged in detail herein.

296.   Defendants have not remedied their breach.

297.   Further, Defendants have refused to provide an adequate and timely warranty repair for the Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Engine failure have been denied adequate repair.

298.   Plaintiffs and the other Class Members suffered injuries due to the defective nature of the Class Vehicles and Defendants' breach of the warranty of merchantability.

299.   As a direct and proximate result of Defendants' breach of the warranty of merchantability, Plaintiffs and the other Class Members have been damaged in an amount to be proven at trial.

## COUNT 5
## FRAUDULENT OMISSION
### (Individually and on behalf of the Alabama Class)

300.   Plaintiffs Reece and Ponder ("Plaintiffs" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

301.   Plaintiffs bring this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

302.   Defendants were aware of the Defect within the Class Vehicles when they marketed and sold the Class Vehicles to Plaintiffs and the other members of the Class.

303.   Having been aware of the Defect within the Class Vehicles and having known that Plaintiffs and the other members of the Class could not have reasonably been expected to know of the Defect, Defendants had a duty to disclose the defect to Plaintiffs and the other members of the Class in connection with the sale or lease of the Class Vehicles.

304.   Defendants did not disclose the Defect to Plaintiffs and the other members of the Class in connection with the sale of the Class Vehicles.

305.   For the reasons set forth above, the Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

306.   In purchasing the Class Vehicles, Plaintiffs and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

307.   Had Plaintiffs and the other members of the Class known of the Defect within the Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for the Class Vehicles.

308.   Through its omissions regarding the Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiffs and the other members of the Class to purchase a Class Vehicle that they otherwise would not have purchased or pay more for a Class Vehicle than they otherwise would have paid.

309.   As a direct and proximate result of Defendants' omissions, Plaintiffs and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**Massachusetts Class**

## COUNT 6
### BREACH OF EXPRESS WARRANTY
### Mass. Gen. Laws Ch. 106 §§ 2-313 and 2A-210
### (Individually and on behalf of the Massachusetts Class)

310.   Plaintiff Ferrara ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

311.   Plaintiff brings this count individually and on behalf of the other members of the Massachusetts Class (the "Class").

312.   Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mass. Gen. Laws Ch. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1)(d).

313.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mass. Gen. Laws Ch. 106 § 2A-103(1)(p).

314.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws Ch. 106 §§ 2-105(1) and 2A-103(1)(h).

315.   In its written express warranties, Defendants expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

316.   Defendants' written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles.

317.   Defendants breached its express warranty to repair defective parts in the Class Vehicles. Defendants admittedly have not repaired the Class Vehicles' Defect.

318.   Defendants were provided notice of the Defect as alleged in detail herein.

319.   Further, Defendants have refused to provide an adequate and timely warranty repair for the Defect, thus rendering the satisfaction of any notice requirement futile. Customers that have presented their vehicles for warranty repair due to engine failure have been denied adequate repairs.

320.   The written express warranties fail of their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because Defendants has failed and/or refused to adequately provide the promised remedies within a reasonable time.

321.    Accordingly, recovery by Plaintiff and the other Class Members is not limited to the remedy of repair, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

322.    Also, as alleged in more detail herein, at the time Defendants warranted and sold the Class Vehicles, they knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Defendants improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

323.    Moreover, most of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Defendants' improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and other Class Members' remedies would be insufficient to make Plaintiff and the other Class Members whole.

324.    As a direct and proximate result of Defendants' breach of its express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial.

**COUNT 7**

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## Mass. Gen. Laws Ch. 106 §§ 20314 and 2A-212
### (Individually and on behalf of the Massachusetts Class)

325.    Plaintiff Ferrara ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

326.    Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts Class (the "Class").

327.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Mass. Gen. Laws Ch. 106 § 2-104(1) and are "sellers" of motor vehicles under § 2-103(1)(d).

328.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mass. Gen. Laws. Ch. 106 § 2A-103(1)(p).

329.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws Ch. 106 §§ 2-105(1) and 2A-103(1)(h).

330.    Defendants manufactured and sold the defective Class Vehicles to Plaintiff and the other Class Members.

331.    The Class vehicles do not comply with the implied warranty of merchantability because, at the time of sale and all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

Specifically, the Class Vehicles suffer from the Defect, which causes the Class Vehicles' Engine to prematurely fail.

332.   This Defect existed at the time the Class Vehicles left control of Defendants.

333.   Based upon these Defect, Defendants have failed to meet the expectations of a reasonable consumer. The Class Vehicles are unfit for their ordinary, intended use, because they suffer from the Defect, resulting in premature engine failure.

334.   Defendants were provided notice of the Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

335.   Further, Defendants have refused to provide an adequate and timely warranty repair for the Defect, thus rendering any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to engine failure have been denied adequate repair.

336.   Plaintiff and the other Class Members suffered injuries due to the defective nature of the Class Vehicles and Defendants' breach of the implied warranty of merchantability.

337.   The above-described Defect in the Class Vehicles were the direct and proximate cause of economic damages to Plaintiff and the other Class Members.

Plaintiffs and the other Class Members have been damaged in an amount to be proven at trial.

## COUNT 8

## FRAUDULENT CONCEALMENT/OMISSION

### (Individually and on behalf of the Massachusetts Class)

338.   Plaintiff Ferrara ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

339.   Plaintiff brings this count individually and on behalf of the other members of the Massachusetts Class (the "Class").

340.   Defendants were aware of the Defect within the engines when it marketed and sold the Class Vehicles to Plaintiff and the other Class Members.

341.   Having been aware of the Defect and having known that Plaintiff and the other Class Members could not have reasonably been expected to know of this Defect, Defendants had a duty to disclose the Defect to Plaintiff and the other Class Members in connection with the sale or lease of the Class Vehicles.

342.   Further, Defendants had a duty to disclose the Defect because the disclosure of the Defect was necessary to dispel misleading impressions about the Class Vehicles' reliability and durability that were or might have been created by partial representation of the facts.

343.   Defendants did not disclose the Defect to Plaintiff and the other Class Members in connection with the sale or lease of the class vehicles.

344. For the reasons set forth above, the Defect within the Class Vehicles comprises material information with respect to the sale of the Class Vehicles.

345. In purchasing or leasing the Class Vehicles, Plaintiff and the other Class Members reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles. Had Plaintiff and the other Class Members known of the Defect, they would not have purchased the Class Vehicles or would have paid less for the Class Vehicles.

346. Through its omissions regarding the Defect within the Engines, Defendants intended to induce, and did induce, Plaintiff and the other Class Members to purchase or lease a Class Vehicle that they otherwise would not have purchased, or to pay more for a Class Vehicle than they otherwise would have paid.

347. As a direct and proximate result of Defendants' omissions, Plaintiff and the other Class Members either paid too much for the Class Vehicles or would not have purchased the Class Vehicles if the Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**Texas Class**

## COUNT 9
**VIOLATION OF TEXAS DECEPTIVE TRADE PRATICES-CONSUMER PROTECTION ACT**
**Tex. Bus. & Com. Code §§ 17.01, *et seq.***
**(Individually and on behalf of the Texas Class)**

348.   Plaintiff Moutra ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

349.   Plaintiff brings this Count individually and on behalf of the other members of the Texas Class (the "Class").

350.   The Texas Deceptive Trade Practices – Consumer Protection Act ("TDTPA") stated that it is unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46.

351.   By the conduct described in detail above and incorporated herein, Defendants engaged in false, misleading, and deceptive trade practices.

352.   Defendants' omissions regarding the Defect, described above, that results in premature engine failure, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or pay the same price for) the Class Vehicles.

353.   Defendants intended for Plaintiff and the other Class members to rely on Defendants' omissions regarding the Defect.

354.   Plaintiff and the other Class Members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described Defect that results in premature engine failure, as evidenced by Plaintiff and the other Class Members' purchases of Class Vehicles.

355.   Had Defendants disclosed all material information regarding the Defect to Plaintiff and the other Class Members, Plaintiff and the other Class Members would not have purchased or leased Class Vehicles or would have paid less to do so.

356.   Defendants' omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members or the consuming public and the other Class Members.

357.   In addition to being deceptive, the business practices of Defendants were unfair because Defendants knowingly sold Plaintiff and the other Class Members Class Vehicles with defective Engines that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiff and the other Class Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class Members or to competition under all of the circumstances. Moreover, in light of Defendants' exclusive knowledge of the Defect, the injury is not one that Plaintiff or the other Class Members could have reasonably avoided.

358.   As a direct and proximate result of Defendants' unfair and deceptive trade practices, Plaintiff and the other Class Members have suffered ascertainable loss and actual damages. Plaintiff and the other Class Members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Defect been

disclosed. Plaintiff and the other Class Members also suffered diminished value of their vehicles. Plaintiff and the other Class Members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under the TDTPA.

**COUNT 10**

**BREACH OF EXPRESS WARRANTY**

**Tex. Bus. & Com. Code §§ 2.313 and 2A.210**

**(Individually and on behalf of the Texas Class)**

359.   Plaintiff Moutra ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

360.   Plaintiff brings this Count individually and on behalf of the Texas Class (the "Class").

361.   Defendants are and were at all relevant times a merchant with respect to the Class Vehicles.

362.   In its written express warranties, Defendants expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

363.   Defendants' written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles equipped with the defective engines.

364.   Defendants breached their express warranties to repair the defects in materials and workmanship within the Class Vehicles. Defendants, admittedly, have

75

not repaired, and have been unable to repair, the Class Vehicles' materials and workmanship defects.

365.    Plaintiff, individually and on behalf of the other Class Members, notified Defendants of the Defect, and its corresponding breach of warranty.

366.    Furthermore, Defendants have refused to provide an adequate and timely warranty repair for the Defect, thus rendering the satisfaction of any notice requirement futile. Customers that have presented their vehicles for warranty repair due to premature engine failure have been denied adequate repairs.

367.    The written express warranties fail of their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because Defendants have failed and/or refused to adequately provide the promised remedies within a reasonable time.

368.    Accordingly, recovery by Plaintiff and the other Class Members is not limited to the express warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies allowed by law.

369.    Also, and as alleged in more detail herein, at the time that Defendants warranted and sold and leased the Class Vehicles, it knew that the Class Vehicles did not conform to the written express warranty and were inherently defective, and Defendants improperly concealed material facts regarding its Class Vehicles.

Plaintiff and the other Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

370.    Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Defendants' improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Class Members' remedies would be insufficient to make them whole.

371.    As a direct and proximate result of Defendants' breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT 11
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Tex. Bus. & Com. Code §§ 2.314 and 2A.212
### (Individually and on behalf of the Texas Class)

372.    Plaintiff Moutra ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

373.    Plaintiff brings this Count individually and on behalf of the Texas Class (the "Class").

374.    Defendants are and were at all relevant times a merchant with respect to motor vehicles under Tex. Bus. & Com. Code §§ 2.104 and 2A.103.

375.    Pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212, a warranty that the Class vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

376.    The Class Vehicles do not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which the vehicles were used. Specifically, the Class Vehicles suffer from the Defect which causes the Class Vehicles' Engine to prematurely fail.

377.    Plaintiff, individually and on behalf of the other Class Members, notified Defendants of the Defect and its corresponding breach of warranty.

378.    Defendants have not remedied their breach.

379.    Further, Defendants have refused to provide an adequate and timely warranty repair for the Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to engine failure have been denied adequate repair.

380.    Plaintiff and the other Class Members suffered injuries due to the defective nature of the Class Vehicles and Defendants' breach of the implied warranty of merchantability.

381.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Class Members have been damaged in an amount to be proven at trial.

## COUNT 12

### FRAUDULENT OMISSION

### (Individually and on behalf of the Texas Class)

382.   Plaintiff Moutra ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

383.   Plaintiff brings this count individually and on behalf of the other members of the Texas Class (the "Class").

384.   Defendants were aware of the Defect within the Class Vehicles' engines when it marketed and sold the Class Vehicles to Plaintiff and the other Class Members.

385.   Having been aware of the Defect within the Class Vehicles' Engines and having known that Plaintiff and the other Class Members could not have reasonably been expected to know of the Defect, Defendants had the duty to disclose the Defect to Plaintiff and the other Class Members in connection with the sale or lease of the Class Vehicles.

386.   Defendants did not disclose the Defect within the Class Vehicles' engines to Plaintiff and the other Class Members in connection with the sale of the Class Vehicles.

387.   For the reasons set forth above, the Defect within the Class Vehicles' Engines comprises material information with respect to the sale or lease of the Class Vehicles.

388.   In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

389.   Had Plaintiff and the other Class Members known of the Defect within the Class Vehicles' Engines, they would not have purchased the Class Vehicles or would have paid less for the Class Vehicles.

390.   Through its omissions regarding the Defect with the Class Vehicles' Engines, Defendants intended to induce, and did induce, Plaintiff and the other Class Members to either purchase a Class Vehicle that they otherwise would not have purchased or pay more for a Class Vehicle than they otherwise would have paid.

391.   As a direct and proximate result of Defendants' omissions, Plaintiff and the other Class Members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.    An order certifying the proposed Classes and designating the named Plaintiffs as the named representatives of the Classes and designating the undersigned as Class Counsel for the Classes;

B.    A declaration that the Engines and/or related components in Class Vehicles are defective;

C.    A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

D.    An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles;

E.    An award to Plaintiffs and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, including overpayment and diminution in value damages, and punitive damages, in an amount to be proven at trial, as well as other damages available at law;

F.    An award to Plaintiffs and Class Members for the return of the purchase or lease price of the Class Vehicles, with interest from the time it was paid, the

reimbursement of the reasonable expenses occasioned by the sale or lease, and damages;

G.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket expenses and damages claims associated with the Defect in Plaintiffs 'and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defect;

H.      A declaration that Defendants must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

I.      An award of attorneys' fees and costs, as allowed by law;

J.      An award of pre-judgment and post-judgment interest, as provided by law;

K.      Leave to amend this Complaint to conform to the evidence produced at trial; and

L.      Such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims so triable.

Respectfully submitted,

Dated:        January 23, 2026

*/s/ James E. Cecchi*
James E. Cecchi
Caroline F. Bartlett
CARELLA BYRNE CECCHI
BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
973-994-1700
973-994-1744 FAX
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com

W. Daniel "Dee" Miles, III
H. Clay Barnett, III
James Mitchell "Mitch" Williams
Dylan T. Martin
Trenton H. Mann
**BEASLEY, ALLEN, CROW,
METHVIN,
PORTIS & MILES, P.C**.
272 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343
(334) 954-7555 FAX
dee.miles@beasleyallen.com
clay.barnett@beasleyallen.com
mitch.williams@beasleyallen.com
dylan.martin@beasleyallen.com
Trent.mann@beasleyallen.com

*Attorneys for Plaintiffs and the Class*

83